**UNITED STATES of America,**
**Plaintiff,**

v.

**David E. BUCKNER and Federal**
**Express Corporation,**
**Defendant.**

**No. Civ. 1:99–CV–288.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

April 10, 2001.

John V. Cardone, U.S. Department of Justice, Tax Division, Washington, DC, for United States of America.

Kirk A. McCarville, Phoenix, AZ, for David E. Buckner.

J. Michael Oehmler, Federal Express Corporation, Legal Department, Litigation, Memphis, TN, for Federal Express Corporation.

## ORDER

WILLIAM C. LEE, Chief Judge.

On December 20, 2000, and in accordance with 28 U.S.C. § 636(b)(1)(B)(C), and N.D.Ind.L.R. 72.1(d)(1) this case was referred to Magistrate Judge Roger Cosbey to submit a Report and Recommendation on Count 1 of the Amended Complaint filed by the plaintiff, the United States of America against the Defendant, David E. Buckner. On February 27, 2001, Magistrate Judge Cosbey conducted a bench

trial, and on March 14, 2001 issued his Report and Recommendation, recommending that judgment be GRANTED in favor of the United States of America and against David E. Buckner on Count 1 of the plaintiff's amended complaint. This Report and Recommendation also informed the parties that, pursuant to § 636(b)(1)(C) of the Federal Magistrates' Act, they had ten days after being served with a copy of the Report and Recommendation to file written objections with the Clerk of the Court, and that failure to object may constitute a waiver of objection on appeal. *See also* N.D.Ind.L.R. 72(d)(2).

More than ten days have passed since the parties have been served with a copy of Magistrate Judge Cosbey's Report and Recommendation and no objections have been filed with the Clerk of the Court. Consequently, this court hereby ADOPTS Magistrate Judge Cosbey's Report and Recommendation, and GRANTS judgment in favor of the United States of America and against the defendant David E. Buckner on Count 1 of the plaintiff's amended complaint.

## *REPORT AND RECOMMENDATION*

### I. INTRODUCTION

On December 20, 2000, and in accordance with 28 U.S.C. § 636(b)(1)(B)(C) and N.D.Ind.L.R. 72.1(d)(1) Chief Judge William C. Lee entered an order referring this case to the undersigned Magistrate Judge to submit a Report and Recommendation on Count I of the Amended Complaint filed by the Plaintiff, the United States of America ("the United States"), against the Defendant, David E. Buckner ("Buckner").

Count I was tried to the undersigned Magistrate Judge on February 27, 2001. Counsel conceded, and the court found subject matter jurisdiction pursuant to 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. § 7402. *See*, January 22, 2001 Pretrial Order ¶ B.

For the following reasons, the undersigned Magistrate Judge recommends that judgment be GRANTED in favor of the United States on its Amended Complaint.

### II. FINDINGS OF FACT[1]

On August 30, 1988, the United States Tax Court entered a decision determining that there were deficiencies with respect to Buckner's 1981, 1982 and 1983 federal income tax liability (the "Subject Liabilities"). (Pretrial Order, G2, Stipulated Fact.)

Pursuant to the Tax Court decision, a delegate of the Secretary of the Treasury made assessments against Buckner for the Subject Liabilities as follows:

| Type of Tax | Date of Assessment | Tax Period | Amount Assessed |
|---|---|---|---|
| 1040 | 10–07–88 | 1981 | $47,125.86 |
| 1040 | 10–07–88 | 1982 | $27,579.63 |
| 1040 | 10–07–88 | 1983 | $25,302.62 |

(Pretrial Order, G3, Stipulated Fact; Certificates of Assessments and Payments, Exhs. 1, 3, 5.)

A delegate of the Secretary of the Treasury then issued notices of the assessments and made demands for payment upon Buckner. (Pretrial Order, G4, Stipulated Fact.) Buckner either refused or neglected to pay fully, and as of July 13, 1990, he owed at least $80,000 on the Subject Liabilities. (Pretrial Order, G5, Stipulated Fact.)

---

1. So as to comply with Fed.R.Civ.P. 52(a) the Court makes the following Findings of Fact which will be set out in narrative fashion. Any finding of fact deemed to be a conclusion of law is hereby incorporated as such, and any conclusion of law deemed to be a finding of fact is hereby incorporated as such.

On July 13, 1990, Buckner held an interest in a retirement plan known as Flying Tiger, Inc. Individually Vested Equity & Security Trust Plan for Pilots (the "Invest Plan") valued at approximately $82,504. (Pretrial Order, G6, Stipulated Fact.) The Vanguard Group ("Vanguard") was the Trustee of the retirement plan and Defendant, Federal Express Corporation ("Federal Express"), was the Plan Administrator.[2] (Pretrial Order, G8, Stipulated Fact.)

On July 13, 1990, a delegate of the Secretary of the Treasury served a Notice of Levy upon Vanguard, as the agent of Federal Express, to collect the Subject Liabilities. The Notice of Levy notified Vanguard of the taxes due and owing from Buckner, and demanded surrender of Buckner's interest in the Invest Plan. (Pretrial Order, G9, Stipulated Fact.). Vanguard never surrendered the Invest Plan, and the levy was never released.

On July 31, 1990, Buckner filed a Chapter 7 petition for bankruptcy. (Pretrial Order, G10, Stipulated Fact.) The Bankruptcy Trustee did not file an action to recover the Invest Plan, and it never became a part of Buckner's bankruptcy estate. (Pretrial Order, G12, Stipulated Fact.) With Buckner's filing for bankruptcy, his income tax indebtedness was referred by the Internal Revenue Service ("I.R.S.") to its Special Procedures Branch ("SPB") in Indianapolis.

On December 20, 1990, the Bankruptcy Court granted Buckner a discharge pursuant to 11 U.S.C. § 727, and pursuant to 11 U.S.C. § 523(a)(1) and 11 U.S.C. § 507(a)(8), the Subject Liabilities were discharged. (Pretrial Order, G10, G11, Stipulated Facts.)

When a bankruptcy discharge is received at the SPB a "bankruptcy technician" determines whether the tax liabilities are dischargeable in accordance with certain criteria, and if so, the technician prepares tax abatement forms for the SPB Manager to approve. However, the policy and routine practice in the SPB was that if more than $100,000 was owed in tax liabilities, such as Buckner owed here, the bankruptcy technician would not take them directly to the Manager, but would have an SPB "advisor" review the matter to make sure the abatements were appropriate.

SPB advisors are responsible for reviewing a large number of bankruptcy cases, all those filed in both Districts of Indiana, and they are to refer them to the I.R.S. District Counsel if a legal issue arises. Thereafter, as to any referred case, the advisor is the liaison between the District Counsel and the SPB. Thus, when the Revenue Officer in the field raised questions about the prior levy (Def.Exh. I), the adviser assigned to Buckner's case, George Roberts ("Roberts") referred the matter in October 1990 to the District Counsel. (*See* Def.Exh. J.)

The referral was assigned by the District Counsel to I.R.S. attorney Timothy Lohrstorfer ("Lohrstorfer"), who undertook to enforce the levy against the Invest Plan. As Lohrstorfer followed this course, he assumed that because Roberts had referred the matter to the District Counsel, no abatement of the assessments would occur while he pursued assets, even if a bankruptcy discharge were granted. So, on April 22, 1991, he contacted both Federal Express and Vanguard, with a copy to Roberts, requesting that the levy be honored. (*See* Plnf.Exh. 12.) On May 8, 1991,

---

**2.** The claim by the United States against Federal Express, essentially to collect Buckner's alleged tax obligation from the Invest Plan, was not referred to the Magistrate Judge for a

Report and Recommendation and by agreement has been deferred pending resolution of the instant dispute.

Federal Express indicated that they would honor the levy on June 3, 1991. (*See* Plnf.Exh. 13.) Thus, by early May 1991, Lohrstorfer·thought it was just a matter of time before the levy would be honored. Nevertheless, Lohrstorfer contacted Vanguard again on May 28, 1991, with another copy to Roberts. (*See* Def.Exh. P.) On May 31, 1991, Lohrstorfer wrote Roberts with more information (Def.Exh. S), attaching a letter from Buckner's counsel (Plnf.Exh. 14) acknowledging that Lohrstorfer had agreed to take no action on the levy until June 10, 1991.

Meanwhile, some months before, and shortly after Buckner's bankruptcy discharge, his attorney wrote the SPB requesting that Buckner's tax liabilities be abated and that all liens be released. (Def.Exh. M). However, while Buckner's counsel attached a separate lien schedule to his letter, he made no mention of the outstanding levy. Given the discharge, and perhaps inspired by counsel's letter, the SPB bankruptcy technician in Buckner's case, Connie Bray ("Bray"), prepared abatement forms. However, because the abatements involved more than $100,000 in taxes, Bray first brought the matter to Roberts in accordance with SPB practice and procedure to verify that the abatements could be entered. The reason for this step is the expectation that Roberts would advise Bray, for example, of any referrals to the District Counsel, or that pre-petition assets were subject to a levy and were about to be collected. However,

Roberts inexplicably failed to tell Bray of his referral of the outstanding levy to District Counsel or that collection was being pursued (*see* Plnf.Exh. 12), and apparently expressed no objection to the proposed abatements.[3]

Bray, whose job would not have involved investigating for any prior levies, and thus unaware of one in Buckner's case, took the abatements (Plnf.Exhs. 9, 10 and 11) to the Manager of the SPB, Lawrence Van Der Moere ("Van Der Moere"). Van Der Moere, equally unaware of the levy, but correctly assuming that Bray had discussed the matter with Roberts in accordance with SPB policy and routine, approved the abatements on May 20, 1991. If Van Der Moere had known of pre-petition assets available to pay Buckner's subject liabilities, such as the levy on the Invest Plan, he would not have authorized the abatements, and would have taken collection action with an abatement occurring only after receipt of the funds. In any event, with Van Der Moere's authorization, the I.R.S. abated the assessments for the Subject Liabilities. However, while the I.R.S. then released its liens, it did not release the levy.

Ultimately, on April 19, 1993 Lohrstorfer checked on the levy because he had heard that tax abatements had occurred in the SPB when assets were otherwise available for the collection of taxes. When Lohrstorfer learned that the levy had not been honored, and that Buckner's liabili-

---

**3.** Understandably, given both the passage of time and the volume of cases, Bray and Roberts have no specific recall of Buckner's case. Moreover, Roberts, who retired six (6) years ago from the I.R.S., now has little memory of SPB procedures or routine. Indeed, given his lack of recall it is difficult to assess at this juncture the level of Robert's job knowledge or the state of his memory eleven (11) years ago. However, it is most likely that Roberts knew that a taxpayer's liabilities should not

be abated following a bankruptcy discharge when a levy was still outstanding. This is somewhat confirmed at one point by his deposition testimony, and as discussed more fully *infra*, the policy and routine in the SPB for cases involving more than $100,000 in taxes. Therefore, it is most likely that when questioned by Bray about the abatements, Roberts simply forgot about his referral and the prior levy.

ties had been abated, he caused the abatements to be reversed, reinstating Buckner's tax liabilities for 1981, 1982 and 1983.

The Amended Complaint now seeks a determination that there is a valid debt for Buckner's 1981, 1982 and 1983 income tax liabilities that can be satisfied from Buckner's Invest Plan.[4]

## CONCLUSIONS OF LAW[5]

■ The I.R.S. is authorized to levy upon a taxpayer's property, even if held by a third party, to collect unpaid taxes. 26 U.S.C. §§ 6331, 6332(a). Therefore, when a Notice of Levy is served it "gives the I.R.S. the right to all property levied upon, and creates a custodial relationship between the person holding the property and the I.R.S. so that the property comes into constructive possession of the government." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 720, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985); *Phelps v. United States*, 421 U.S. 330, 334, 95 S.Ct. 1728, 44 L.Ed.2d 201 (1975); *United States v. Eiland*, 223 F.2d 118 (4th Cir.1955) (The notice of levy gives the United States the right to all property levied upon, whether tangible or intangible.).

Accordingly, when the I.R.S. served a Notice of Levy upon Vanguard as the trustee of the Invest Plan, Buckner's interest in that fund came into the "constructive possession" of the government. *Nat'l Bank of Commerce*, 472 U.S. at 720, 105 S.Ct. 2919. However, when Buckner filed his bankruptcy petition shortly thereafter, the ability of the I.R.S. to enforce the levy was automatically stayed. *See* 11 U.S.C. § 362.

■ When the bankruptcy court issued its Order of Discharge, Buckner's personal liability for all pre-bankruptcy debts was discharged, 11 U.S.C. §§ 727, 944, 1141, 1228, 1328, and his creditors were enjoined from collecting those debts from Buckner personally, 11 U.S.C. § 524(a)(1), (2). However, the order did not affect the ability of the I.R.S. to proceed *in rem* by levying upon the Invest Plan to satisfy the discharged taxes. *See Johnson v. Home State Bank*, 501 U.S. 78, 84, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) ("[A] bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor *in personam*."); *see also, In re Conston*, 181 B.R. 769, 773 (D.Del.1995) (collecting cases).

This is particularly true since the I.R.S. never released its levy on the Invest Plan, an asset that remained outside the bankruptcy estate, 11 U.S.C. § 541(c)(2). This brings into focus the central question before the Court, the legal effect of the post-discharge tax abatements, and their subsequent reversal.

■ An assessment reflects the I.R.S.'s judgment of what taxes are owed by the taxpayer as recorded on the I.R.S.'s books of account. *See Cohen v. Mayer*, 199 F.Supp. 331, 332 (D.N.J.1961), *aff'd sub nom., Cohen v. Gross*, 316 F.2d 521 (3d Cir.1963) (Assessment is a "prescribed procedure for officially recording the fact and the amount of a taxpayer's administratively determined tax liability, with consequences somewhat similar to the reduction of a claim to judgment."). However, while an assessment might reflect a tax liability, taxpayers are liable for taxes regardless of whether they have been assessed. *See*

---

4. Counsel agreed at trial that in the event the Court finds a valid tax indebtedness, the precise amount can be stipulated. Counsel for Buckner also concedes that any alleged tax liability exceeds the amount in the Invest Plan.

5. Footnote 1, *supra*, is incorporated by this reference.

*Ewing v. U.S.,* 914 F.2d 499, 502–03 (4th Cir.1990) (rejecting argument that prior to assessment taxpayer had no tax liability and therefore no "payment of" taxes was due) (*cert. denied,* 500 U.S. 905, 111 S.Ct. 1683, 114 L.Ed.2d 78 (1991)).

■ This brings us to the accounting concept of an abatement as authorized under 26 U.S.C. § 6404(c) ("§ 6404(c)").[6] A careful reading of that statute reflects that it provides for the abatement of any unpaid portion of the assessment of "any tax" or the assessment of any "liability in respect thereof," but does not authorize the abatement of a tax liability. *See* 26 U.S.C. § 6404(c). In other words, a § 6404(c) abatement is not designed to reflect a taxpayers true liability, but only the judgment of the I.R.S. that collecting the tax would not be cost effective, and that it should therefore be removed from the books. Indeed, § 6404(c) simply codifies early I.R.S. administrative practices. *See, e.g., Carlin v. U.S.,* 121 Ct.Cl. 643, 100 F.Supp. 451, 454–55 (1951); *Sugar Run Coal Mining v. U.S.,* 21 F.Supp. 10–11 (E.D.Pa.1937); *Kroyer v. United States,* 73 Ct.Cl. 591, 55 F.2d 495, 499 (1932).

Stated simply, a § 6404(c) abatement reflects a determination by the I.R.S. of a taxpayer's collectability, and since the I.R.S. may account for collectable assets by simply entering a debit to reverse a prior credit, no formal reassessment procedure must be followed. *Crompton–Rich-*

*mond v. United States,* 311 F.Supp. 1184, 1186 (S.D.N.Y.1970); *Carlin,* 100 F.Supp. at 454–55; *Sugar Run Coal Mining,* 21 F.Supp. at 12–13. Therefore, the § 6404(c) abatements here did not extinguish Buckner's debt, and the I.R.S. was free to reverse them when it later determined that at least a portion of his taxes were collectible as a result of the prepetition levy.[7]

This brings us to the heart of Buckner's argument, that a previously abated assessment can only be reinstated if the abatement was due to an ordinary clerical or bookkeeping error, and in this instance the abatements resulted from a conscious decision in the SPB to abate the taxes after Buckner's bankruptcy. However, the evidence does not support what apparently is Buckner's key premise, "that the [SPB] routinely and automatically, with deliberate preplanning, abated taxes and released liens in asset and no asset Chapter 7 bankruptcies where the taxes met the criteria for dischargeability under 11 U.S.C. § 523." (*See* Buckner Trial Brief at 10.) In fact, prior to any abatement involving more than $100,000 in taxes, the bankruptcy technician would routinely contact the bankruptcy advisor to determine if the tax indebtedness could still be collected (or was in the process of being collected) before presenting the abatements to the SPB Manager. *See, e.g.,* 1 Michael Graham, *Handbook of Federal Evidence,* § 406.3

---

6. The statute reads as follows:
    (c) Small tax balances—the Secretary is authorized to abate the unpaid portion of the assessment of any tax, or any liability in respect thereof, if the Secretary determines under the uniform rules prescribed by the Secretary that the administration and collection costs involved would not warrant collection of the amount due.

7. This might be a different case if Buckner's taxes had been abated under 26 U.S.C. § 6404(a) ("§ 6404(a)"). Indeed, § 6404(a)

clearly speaks to abatements made on the merits as detailed in subparts (1), (2) and (3), and is designed to reflect the taxpayer's true liability on the books of the I.R.S. *See* 26 U.S.C. § 6404(a)(1)–(3); *see also, Kroyer,* 55 F.2d at 499. Thus, since reversing an abatement under § 6404(a) amounts to a reassessment, the I.R.S. must provide the normal process that is due the taxpayer for any substantive determination of liability within the applicable period of limitations. *Carlin,* 100 F.Supp. at 454.

(4th ed. 1996) ("[E]vidence of a routine practice ... of an organization is admissible as tending to prove that it was followed on the occasion in question...."). The point to be made here is that if the abatements were as routine and automatic as Buckner maintains, there would have been no need for the bankruptcy technician to confer with the advisor at all. Stated somewhat differently, the simple fact that the bankruptcy technician was required to confer with the advisor, and routinely undertook to do so, before presenting the abatements to the SPB manager for approval demonstrates that they were not routinely or automatically entered.

Unfortunately, when Bray presented the possibility of abating Buckner's taxes to Roberts, he inexplicably raised no objection, most likely because he forget about the levy, his prior referral to the District Counsel, or even that Lohrstorfer was actively pursuing collection. Nonetheless, Van Der Moere convincingly testified that he would not have approved the abatements if he had known of the outstanding levy, which only would have been made known to him had Roberts informed Bray. Thus, the preponderance of the evidence leads to the conclusion that the abatements here were the result of a purely accidental or unintended processing error, spawned by Robert's faulty memory and not the conscious decision by anyone in the SPB to abate over $100,000 in tax liabilities. *See Crompton-Richmond Co.,* 311 F.Supp. at 1187; *Kroyer,* 55 F.2d at 499; *United States v. Cooper,* No. 82–0904, 1983 WL 1587 *1 (D.D.C. Feb. 9, 1983). Finally, Buckner has presented no evidence of prejudice. *Id.*

Nevertheless, Buckner cites *In re Bugge,* 99 F.3d 740 (5th Cir.1996), a case where an abatement due an accidental processing error was held to be ineffective and unauthorized under § 6404(a). 99 F.3d at 745. Apparently, Buckner seizes upon an argument that was not supported by the evidence in *Bugge,* or for that matter here, that the abatements should be upheld because they "resulted from conscious decisions made by I.R.S. personnel...." *Id.* at 745, n. 6. However, as noted *supra,* the abatement here, as in *Bugge,* was purely accidental and unintended, and while the fault in *Bugge* was attributed to a "computer system in transition," the problem in this instance was human error—Roberts' faulty memory. In any event, the record does not support that any I.R.S. personnel consciously decided to abate Buckner's taxes in the face of an outstanding levy.

While Buckner goes on to argue that expiration of the statute of limitations forecloses a reassessment of Buckner's tax liabilities and that the bankruptcy court's Order of Discharge prevents execution on the levy, this fails to recognize that his taxes may be collected by either a levy or by a proceeding in court provided that the levy or proceeding is begun within ten years of the assessment.[8] *See* 26 U.S.C. § 6502(a). Here, with the 1995 reversal of the abatements under § 6404(c) within the ten year collection period, it is clear that both the 1990 levy and this proceeding were timely.[9]

---

8. Congress extended the six year period of limitations to 10 years for all tax liabilities which had not expired on or before November 5, 1990, *see* Public Law No. 101–508, 104 Stat. 1388–458 (Codified as amended at 26 U.S.C. § 6502(a)). Clearly, Buckner's tax liabilities fall into that category.

9. The United States gets the benefit of the 10 year statute of limitations set out in 26 U.S.C. § 6502(a)(1), which accrues from the October 7, 1988 assessment. While this case was filed on July 14, 1999, and ostensibly exceeds the 10 years statutory period, 26 U.S.C. § 6503(h) tolls the running of the statute of limitations during the automatic stay provision of 11

As for the legal effect of the Discharge Order, as noted *supra*, it does not preclude action on the levy which constitutes an *in rem* action against the Invest Plan. *See Johnson,* 501 U.S. at 84, 111 S.Ct. 2150. Therefore, because there is a valid debt owed by Buckner for his 1981, 1982 and 1983 income tax liabilities, it can be partially satisfied by the levy on the Invest Plan.

## CONCLUSION

It is the recommendation of the undersigned Magistrate Judge that judgment be entered in favor of the United States and against Buckner decreeing that there is a valid debt for David Buckner's 1981, 1982 and 1983 income tax liabilities together with interest and that this debt can be satisfied from David Buckner's pre-bankruptcy property that was not part of the bankruptcy estate and which is the subject of a pre-bankruptcy petition levy.

NOTICE IS HEREBY GIVEN that within ten (10) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed.R.Civ.P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Lerro v. Quaker Oats Co.,* 84 F.3d 239 (7th Cir.1996); *Lockert v. Faulkner,* 843 F.2d 1015 (7th Cir.1988); *Video Views, Inc. v. Studio 21 Ltd.,* 797 F.2d 538 (7th Cir.1986).

U.S.C. § 362 and for six months thereafter. *See* 26 U.S.C. § 6503(h); *United States v. Mazzeo,* 245 B.R. 435, 444 (E.D.N.Y.1999) (citing *In re Montoya,* 965 F.2d 554 (7th Cir. 1992)). Thus, adding six months to Buckner's December 20, 1990, discharge means

COSBEY, United States Magistrate Judge.

Enter for March 14, 2001.

that the statute for this action was tolled for nearly 11 months. Adding those 11 months to the October 7, 1988, assessment date means that the July 14, 1999, filing date was timely.