407 F.3d 89
 In Re: Stuart BECKER, Debtor.
Stuart Becker, Debtor-Appellant,
v.
Internal Revenue Service, Appellee.
 Docket No. 03-5005.
 United States Court of Appeals, Second Circuit.
 Argued: October 15, 2004.
 Decided: April 28, 2005.
 
 Stuart A. Smith, New York, New York for Debtor-Appellant.
 Nicole Gueron, Assistant United States Attorney, New York, New York (David N. Kelley, United States Attorney for the Southern District of New York, David S. Jones, Assistant United States Attorney, New York, New York, on the brief), for Appellee.
 Before: OAKES, KEARSE, and CALABRESI, Circuit Judges.
 Judge CALABRESI dissents in a separate opinion.
 KEARSE, Circuit Judge.
 
 
 1
 Debtor Stuart Becker appeals from a judgment of the United States District Court for the Southern District of New York, Lewis A. Kaplan, Judge, affirming an order of the United States Bankruptcy Court for the Southern District of New York, Cornelius Blackshear, Judge, entered after a trial, ruling that the Internal Revenue Service ("IRS") was entitled to assert a claim against Becker's bankruptcy estate for unpaid employment taxes despite the fact that the timely assessment against Becker for those taxes had been erroneously abated and was reinstated only after the limitations periods for making such assessments had expired. On appeal, Becker contends that the district and bankruptcy courts should have found the reinstatement ineffective because it was barred either by the statute of limitations or by principles of equitable estoppel. Finding no merit in his contentions, we affirm.
 
 I. BACKGROUND
 
 2
 Under the Internal Revenue Code, 26 U.S.C. § 3101 et seq. ("Code" or "LR.C."), an employer is required to withhold from employee compensation, and remit to the government, employee income taxes, see I.R.C. § 3402, and taxes pursuant to the Federal Insurance Contribution Act ("FICA"), see id. § 3102 (collectively "withholding taxes" or "employment taxes"). See generally id. § 7501(a) ("Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States."). If the employer has not paid withholding taxes to the government as required, the Code imposes personal liability on any "responsible person," i.e., any person who "has significant control over the enterprise's finances," Hochstein v. United States, 900 F.2d 543, 547 (2d. Cir. 1990), with authority to direct payments from the employer's funds, see, e.g., United States v. Rem, 38 F.3d 634, 642 (2d Cir. 1994), where that person has "willfully fail[ed]" to pay the taxes, I.R.C. § 6672(a). Such a person is liable for, inter alia, 100% of the taxes owed and unpaid (" § 6672(a) liability"). See id.; Hochstein v. United States, 900 F.2d at 546.
 
 
 3
 The events leading to the IRS's assertion of § 6672(a) liability against Becker are largely undisputed, the facts having been stipulated to just prior to the trial held in the bankruptcy court (see Joint Pre-Trial Order ("JPTO") dated September 10, 1999, approved by the bankruptcy court on September 13, 1999). The events subsequent to the IRS's assessment of that liability were described in testimony given at the bankruptcy court trial and are undisputed except as indicated below.
 
 
 4
 A. The Assessment, the Erroneous Abatement, and the Reinstatement
 
 
 5
 Becker, a certified public accountant, was the founder, president, and majority stockholder of Stuart Becker & Company, P.C. (the "Becker Firm" or the "P.C."), a tax advisory firm. To the extent pertinent to this appeal, the P.C. failed to pay the withholding taxes due for the third quarter of 1986 and for all four quarters of 1987 (see JPTO § 5.B.i.). During those periods, Becker "was aware that the P.C. was not paying its withholding taxes and was paying other liabilities." (JPTO § 5.B.ii.)
 
 
 6
 The Becker Firm's unpaid withholding taxes due for those periods totaled $182,562.49. (See JPTO § 5.B.iii.) In June 1988, the IRS assessed that sum in § 6672(a) liability against Becker; in July 1988, Becker was informed of the assessment by a letter describing the specific periods for which he was being assessed, the amounts attributable to each period, and his right to appeal the IRS assessment. (See id.) Becker did not appeal the assessment. (See Trial Transcript, September 13, 1999 ("Sept. 13 Tr."), at 74-75.)
 
 
 7
 Responsibility for collecting these unpaid taxes was assigned to IRS Revenue Officer Paul Peters. By October 10, 1989, Peters had collected $7,499.97 of the $182,562.49 due. He thus prepared an IRS Form 3870 ("First Form 3870") in order to request an adjustment to Becker's account to reflect the reduction of the original assessment pro tanto. On this form, Peters stated that the Becker Firm "has a reduced balance for . . . trust fund taxes due. A levy on an account receivable resulted in payment of above amount. Therefore, the 100% assessment must be reduced by this figure." (Government Exhibit O (emphases added); see Sept. 13 Tr. at 105.) Peters sent this First Form 3870 to the IRS Brookhaven Service Center ("service center"). However, he had neglected to fill in the amount of the partial payment and the resulting requested "reduc[tion]."
 
 
 8
 As sent to the service center by Peters, the First Form 3870 showed neither the amount of the requested adjustment nor the amount of the original assessment. At the service center, someone wrote on this form the amount of the original assessment, $182,562.49, in the box headed "Credit Adjustment." The IRS employee who processed this form then abated Becker's liability in full. On November 20, 1989, the IRS sent Becker a notice for the period ending December 31, 1987, showing a balance due of only $20.78.
 
 
 9
 In early December 1989, Peters discovered that the entire assessment against Becker had been abated. After conferring with a number of colleagues as to how to have the error corrected, Peters sent a new Form 3870 ("Second Form 3870") to the service center on January 10, 1990, stating that the service center's abatement of the assessment in full was a mistake. Peters requested that the assessment against Becker for the unpaid amount of the withholding taxes be reinstated to the extent of $175,062.52, "represent[ing] the original assessment minus the proposed abatement," plus interest. (Government Exhibit P.)
 
 
 10
 Some months later, Peters was informed that it would take the service center six months to reverse the abatement of the assessment. (JPTO § 5.B.iv.) Peters determined that he could not undertake any collection efforts against Becker until the assessment was reinstated.
 
 
 11
 In the meantime, Peters informed Becker that the assessment had been abated erroneously and would be reinstated. Peters testified that he first had such a conversation with Becker in July 1990 and that Becker did not suggest that the abatement was correct but rather responded that he would pay the assessment upon its reinstatement. (See Sept. 13 Tr. at 109-11.) Peters testified that he discussed the matter with Becker again on September 27, 1990, and that Becker stated that he wanted to pay the remaining amount on the assessment when reinstated. (See id. at 111-12.) Becker, in contrast, testified that he had believed the assessment had been abated correctly rather than erroneously (see id. at 43-44) and that he did not find out that he still had a § 6672(a) liability "problem" until after September 1991 (id. at 47). And in a December 1996 deposition Becker had testified that he did not recall that Peters had "[]ever told [him] that there had been an erroneous abatement that the IRS was going to reverse and reinstate" (Deposition of Stuart Becker ("Becker Dep."), at 253-54; see also id. at 231 ("[t]o the best of [Becker's] knowledge," "Peters never told [Becker] that the 6672 penalty for third quarter '86 and the four quarters of '87 would be reinstated")). However, some six months before giving that deposition testimony, Becker had submitted to the court his affidavit revealing explicitly that he and Peters discussed the anticipated reinstatement at least as early as September 1990 and that Becker had stated that he would be prepared to pay the assessment upon its reinstatement:
 
 
 12
 On or about September 27, 1990, I spoke with Revenue Officer Peters to inform him I would shortly have the funds available to pay my § 6672 liabilities if the abatement of those penalties were reversed and there was a balance due.
 
 
 13
 (Affidavit of Stuart Becker dated June 20, 1996 ("Becker Aff."), ¶ 6.) When cross-examined about this affidavit at trial, Becker testified that he had no recollection of such a conversation but that his affidavit was truthful. (See Sept. 13 Tr. at 78-80.) The § 6672(a) liability assessment against Becker was reinstated by the IRS service center on or about April 18, 1991. However, the reinstatement was recorded in a so-called "nonmaster file," i.e., a handwritten file maintained only at a service center, not one entered and maintained electronically in the IRS's computerized master files. (See Trial Transcript, September 14, 1999 ("Sept. 14 Tr."), at 74-76.) In 1991, reversals of erroneous abatements were customarily recorded only in nonmaster files because such reversals were not compatible with the IRS's master-file software; and account activities processed in a nonmaster file were not reflected in a taxpayer's master file. (See id.) On September 11, 1991, based on the status of Becker's master file, which did not reflect the reinstatement recorded in his nonmaster file, the IRS filed a release of its tax lien against Becker. (See JPTO § 5.B.ix.) As late as November 1992, Becker's master account file still did not reflect his reinstated remaining § 6672(a) liability. (See id. § 5.B.x.)
 
 
 14
 In the meantime, on September 3, 1991, Peters had learned from the service center of the reinstatement of the assessment against Becker in Becker's nonmaster file. Peters then attempted to meet with Becker; he later met with Becker's authorized representative Scott Ehrenpreis. The subject of Peters's conversation with Ehrenpreis was the erroneous abatement and reinstatement of Becker's § 6672(a) liability. (See Sept. 14 Tr. at 60-63.) Peters testified that he told Ehrenpreis that Becker's tax liability had been abated erroneously (see id. at 60-61) and that the assessment had been reinstated (see id. at 62-63). Ehrenpreis testified that he did not remember such a conversation. (See id. at 122.) However, he had requested and received from Peters a copy of Becker's master file transcript, which stated that Becker had no § 6672(a) liability (see, e.g., id. at 48; Becker Aff. ¶ 5), and Ehrenpreis had made a notation on his copy of the transcript that "12-87 was abated erroneously" (Government Exhibit W at 12; see Sept. 14 Tr. at 119-121).
 
 B. The Bankruptcy Proceedings
 
 15
 In July 1992, Becker filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. In his attached schedule of creditors holding unsecured priority claims, Becker listed the IRS as having a claim with respect to "withholding taxes" in the amount of $150,000. Becker did not identify that claim as one that was "disputed." (See Government Exhibit A at 9.)
 
 
 16
 On November 20, 1992, the IRS filed a proof of claim for $144,522.50, plus interest, for the outstanding portion of Becker's § 6672(a) liability assessment. The amount of the claim was subsequently reduced to reflect payments by nondebtors that were applied toward that liability.
 
 
 17
 In December 1994, Becker filed a Plan of Reorganization, in which he proposed to pay the IRS's claim over a period of six years. The IRS objected. Becker then filed an objection to the IRS's proof of claim with respect to his § 6672(a) liability and sought to have that claim reduced or rejected. He contended that, because the statute of limitations on the IRS's ability to impose an initial assessment for his § 6672(a) liability would have run on April 15, 1991, the IRS's attempt to reinstate the assessment on April 18, 1991, was untimely. After a period of discovery and unsuccessful motions by both sides for summary judgment, a trial was held on the § 6672(a) claim and one other claim that is not relevant to this appeal. The witnesses included Becker, Peters, and Ehrenpreis, portions of whose testimony are described in Part I.A. above.
 
 
 18
 In a Decision Regarding Claims of Internal Revenue Service against the Debtor Stuart Becker, dated March 18, 2002 ("Bankruptcy Court Decision"), issued after trial, the bankruptcy court overruled Becker's objection to the IRS's claim as to his § 6672(a) liability. The bankruptcy court noted that, "[f]rom the materials before the Court, it appears that the Debtor does not dispute [that] ... the Debtor was the `responsible person' at the [Becker Firm], and the Debtor willfully failed to pay over the withheld taxes." Bankruptcy Court Decision at 12. The court framed the contested issue as whether Becker remained liable "where the I.R.S. erroneously abated [his] firm's liability but reinstated the liability after the statute of limitations had run." Id. at 3. Citing Crompton-Richmond Co. v. United States, 311 F.Supp. 1184, 1187 (S.D.N.Y. 1970) ("Crompton-Richmond"), and Bugge v. United States, 99 F.3d 740, 745-46 (5th Cir.1996) ("Bugge"), the court concluded that that question should be answered in the affirmative, "so long as the taxpayer is not prejudiced." Bankruptcy Court Decision at 13.
 
 
 19
 Stating that "[a] taxpayer is not prejudiced where: (1) there is no substantive reevaluation of the taxpayer's liability; and (2) the taxpayer's liability remains the same as it was at the original assessment," id., the court found that Becker had not met this test.
 
 
 20
 In this case, the Debtor has not shown that he has suffered prejudice as required under Crompton-Richmond or under Bugge. Instead, the evidence shows that the Debtor's reinstated liability is the same amount as it was when originally assessed, minus credits for payments made.... Furthermore, there is nothing before the Court to suggest that the I.R.S. reevaluated, and then increased, the Debtor's liability, so as to prejudice the Debtor. Under these circumstances, the I.R.S. assessment made in April 1991 stands. The Debtor's objection to the Proofs of Claim is overruled.
 
 
 21
 
 Id.
 
 
 
 22
 Becker appealed the decision of the bankruptcy court to the district court, contending that the IRS's reinstatement of the assessment should have been ruled ineffective (a) because the reinstatement occurred after expiration of the statute-of-limitations period applicable to the initial assessment, (b) because the assessment was not reinstated—and he was not notified of the reinstatement—within a reasonable time, or (c) because he relied on the abatement, to his detriment.
 
 C. The Decision of the District Court
 
 23
 In a Memorandum Opinion dated November 27, 2002, reported at 286 B.R. 250, the district court affirmed the decision of the bankruptcy court, finding, inter alia, that Becker had failed as a matter of law to show detrimental reliance on the abatement. The district court noted that Becker asserted four claims of detrimental reliance, two relating to family expenses and two relating to settlements of business claims. However, because only the business-claim settlements had been mentioned in the joint pretrial order, and because there was no indication that the bankruptcy court had considered the family-expenses allegations to be properly before it, see Fed.R.Civ.P. 16(e) ("[pretrial] order shall control the subsequent course of the action unless modified by a subsequent order"), the district court ruled that only the assertions that Becker had relied on the abatement in settling the business claims were within the proper scope of the appeal. See 286 B.R. at 254.
 
 
 24
 The two business-claim settlements as to which Becker claimed detrimental reliance were (1) his agreement to settle an adversary action brought by a group of creditor banks by paying them at least $300,000, and (2) his agreement to pay at least $120,000 to the bankruptcy estate of Laventhol & Horvath ("Laventhol"), a firm he had joined after the collapse of his own P.C. The district court found both claims of reliance meritless.
 
 
 25
 As to Becker's assertion that he relied on the abatement in agreeing to pay the banks, the court found that claim to be "patently bogus" in light of the fact that Becker did not enter into that agreement until after he learned that the abatement had been undone and the assessment had been reinstated:
 
 
 26
 When asked what he did in reliance on the abatement of the assessment, the debtor testified, in relevant part, that he entered into a stipulation of settlement of adversary proceedings brought against him by a group of banks, a stipulation that required him to make quite substantial payments to the banks. On cross-examination, however, the debtor admitted that he settled the adversary proceedings after the IRS filing its proof of claim in the bankruptcy. Thus, at the time the debtor entered into the settlement and agreed to make the payments upon which he now relies, he knew that the assessment had been reinstated and that the IRS claimed that he owed the employment taxes at issue.
 
 
 27
 Id. at 254-55 (footnotes omitted) (emphasis in original).
 
 
 28
 The court found Becker's claim that he relied on the abatement in entering the Laventhol settlement to be "equally deficient," stating that
 
 
 29
 the only evidence of record shows that the Laventhol settlement was approved by the Court below in January 1994, some fourteen months after the filing of the IRS's proof of claim.... The burden of proving detrimental reliance was on the debtor, as his position was analogous to a claim of equitable estoppel. And. . . he came forward with no evidence that he obligated himself to the Laventhol settlement before the proof of claim was filed. . . .
 
 
 30
 Id. at 255 (footnote omitted).
 
 
 31
 Given that Becker had not entered into the above agreements until after he was aware that the abatement was rescinded and the assessment reinstated, the district court concluded that Becker's claims of detrimental reliance were meritless as a matter of law. See id. (any reliance on the abatement in settling with the banks "would have been unreasonable as a matter of law"; "as a matter of law, th[e] debtor offered insufficient proof to warrant a conclusion that he reasonably relied to his detriment on the erroneous abatement in entering into the Laventhol settlement").
 
 
 32
 Accordingly, the district court affirmed the decision of the bankruptcy court rejecting Becker's objection to the IRS's proof of claim. This appeal followed.
 
 II. DISCUSSION
 
 33
 On appeal, Becker contends that the district and bankruptcy courts erred in upholding the IRS's reinstatement of the § 6672(a) liability assessment against him after the statute of limitations for imposition of the assessment had run (a) because "[i]t is well settled that tax statutes of limitations must be construed strictly against both taxpayers and the government alike because they are neutral rules that are prescribed by Congress to implement important policies of repose" (Becker brief on appeal at 20 (citing Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945))), and (b) because the IRS did not reinstate the assessment or notify Becker of the reinstatement within a reasonable time (see Becker brief on appeal at 16 (contending that a "three-year hiatus between abatement and notification to the taxpayer" should be ruled unreasonable as a matter of law)). He also argues that the reinstatement should not be upheld because he relied, to his detriment, on the abatement and on the reassurances he received from the IRS that he no longer had any § 6672(a) liability.
 
 
 34
 Reviewing the district and bankruptcy courts' conclusions of law de novo, and there being no genuine issue as to any fact material to the application of the controlling legal principles, we find no merit in Becker's contentions, and we affirm.
 
 A. The Statute of Limitations
 
 35
 To the extent pertinent here, the Internal Revenue Code provides a three-year statute of limitations on the IRS's imposition of an assessment of taxes owing under the Code. See I.R.C. § 6501(a). As to withholding taxes due with respect to a given calendar year, the statute of limitations begins to run on April 15 of the following year. See id. § 6501(b)(2). The limitations period for assessing "responsible person" liabilities is substantially the same. See id. § 6672(b)(3).
 
 
 36
 The Code allows the IRS to abate an assessment in certain circumstances:
 
 
 37
 (a) General rule
 
 
 38
 The Secretary is authorized to abate the unpaid portion of the assessment of any tax or any liability in respect thereof, which—
 
 
 39
 (1) is excessive in amount, or
 
 
 40
 (2) is assessed after the expiration of the period of limitation properly applicable thereto, or
 
 
 41
 (3) is erroneously or illegally assessed.
 
 
 42
 I.R.C. § 6404(a). Subsection (c) of § 6404 allows abatement of an assessment for a different reason, one that pertains to the collectability, rather than the validity, of the assessment. That subsection provides that an assessment may be abated if the IRS "determines under uniform rules prescribed by the Secretary that the administration and collection costs involved would not warrant collection of the amount due." I.R.C. § 6404(c).
 
 
 43
 The effect of the statute of limitations on an IRS attempt to undo an abated assessment depends largely on the impetus for the abatement. As a general matter,
 
 
 44
 [s]tatutes of limitations find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost.
 
 
 45
 Chase Securities Corp. v. Donaldson, 325 U.S. at 314, 65 S.Ct. 1137; see, e.g., Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 349, 64 S.Ct. 582, 88 L.Ed. 788 (1944) ("Railroad Telegraphers"). The "shelter" of a statute of limitations "has never been regarded as what now is called a `fundamental' right or what used to be called a `natural' right of the individual." Chase Securities Corp., 325 U.S. at 314, 65 S.Ct. 1137.
 
 
 46
 Insofar as the federal tax laws are concerned,
 
 
 47
 [i]t probably would be all but intolerable, at least Congress has regarded it as ill-advised, to have an income tax system under which there never would come a day of final settlement and which required both the taxpayer and the Government to stand ready forever and a day to produce vouchers, prove events, establish values and recall details of all that goes into an income tax contest. Hence, a statute of limitation is an almost indispensable element of fairness as well as of practical administration of an income tax policy.
 
 
 48
 . . . . "Statutes of limitation, like the equitable doctrine of laches, in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them."
 
 
 49
 Rothensies v. Electric Storage Battery Co., 329 U.S. 296, 301, 67 S.Ct. 271, 91 L.Ed. 296 (1946) (quoting Railroad Telegraphers, 321 U.S. at 348-49, 64 S.Ct. 582).
 
 
 50
 With respect to abatements of tax assessments, the applicability of the statute of limitations turns on whether the IRS has attempted to undo the abatement because it has changed its view of the taxpayer's liability or for some other reason. If an assessment is properly abated pursuant to subsection (a)(1), (2), or (3) of I.R.C. § 6404, quoted above—all of which pertain to assessments made in error—the abatement entirely extinguishes the assessment. See, e.g., Crompton-Richmond, 311 F.Supp. at 1186 ("An assessment abated under (a)(1) ... is thereby cancelled and cannot be resurrected if the IRS later decides that its decision was incorrect."). In order to undo that abatement, the IRS would be required to impose a new assessment; and, to be effective, that new assessment would need to be imposed within the limitations period. See generally Bugge, 99 F.3d at 744; Crompton-Richmond, 311 F.Supp. at 1186. In contrast, the cancellation of an abatement done pursuant to subsection (c) of § 6404 on the ground of uncollectability may permissibly be undone, and the assessment reinstated without the need for a new assessment within the limitations period applicable for the initial assessment, "because the abatement of an uncollectible tax, according to IRS regulations, is not deemed to have cancelled the tax," Crompton-Richmond, 311 F.Supp. at 1186; see, e.g., Kroyer v. United States, 73 Ct.Cl. 591, 55 F.2d 495, 499 (1932) ("Kroyer") (abatement because of "uncollectab[ility]" "does not cancel or annul the tax"); United States v. Buckner, 264 B.R. 908, 914-15 (N.D.Ind.2001) (reinstatement of assessment abated under § 6404(c) permissible, even though the limitations period for the initial assessment had expired, because a subsection (c) abatement "does not authorize the abatement of a tax liability").
 
 
 51
 Becker has not called to our attention any case, and we are aware of none, holding that the reinstatement of an assessment that was in fact imposed within the limitations period and was abated because of an inadvertent ministerial error is barred by the statute of limitations simply because the reinstatement occurred after that period ended.
 
 
 52
 Moreover, in the present case, none of the policies underlying statutes of limitations are implicated. As for the statute of limitations itself, the latest year for which § 6672(a) liability was imposed on Becker was 1987; thus, the last limitations period for assessment of § 6672(a) liability against him expired three years after April 15, 1988, i.e., on April 15, 1991. The assessment was imposed on Becker in June 1988, less than half-way through the limitations period.
 
 
 53
 There was no possibility that the IRS's claim had become stale. As set forth in Part I.A. above, Becker was notified in July 1988 that the assessment had been imposed; at that time, he was also informed of how the assessment had been computed and of his right to appeal. Becker thus had every opportunity to marshal whatever evidence existed to dispute the IRS's findings that, inter alia, he was a "responsible person" in the Becker Firm or that he had failed to pay the employment taxes "willfully." He did not appeal.
 
 
 54
 Further, Becker was seasonably informed of the erroneous abatement of the assessment and of its eventual reinstatement. By September 27, 1990, at the latest, by his own admission, Becker knew that the assessment had been erroneously abated and would be reinstated, and he told Peters that he wanted to pay the assessment when it was reinstated. Becker's designated representative was informed of the reinstatement in November 1991.
 
 
 55
 In sum, there is plainly no basis for suggesting that the IRS's claim was "allowed to slumber until evidence ha[d] been lost, memories ha[d] faded, and witnesses ha[d] disappeared," or that Becker lacked notice of the reinstatement, or that the IRS's assertion of its § 6672(a) claim in November 1992 in the bankruptcy proceeding came as any "surprise[]," Railroad Telegraphers, 321 U.S. at 348, 64 S.Ct. 582. Indeed, in July 1992, when Becker filed his bankruptcy petition, he had listed the § 6672(a) assessment as an undisputed $150,000 claim of the IRS.
 
 B. Estoppel
 
 56
 Rather than a statute-of-limitations defense, Becker's arguments are more akin to a defense of equitable estoppel, as he claims that the IRS should not be allowed to rely on a reinstatement that was effected after a long period of delay. Parenthetically, we note that Becker's suggestion that there was a "three-year hiatus" between the abatement and notification of the error or of the reinstatement (Becker brief on appeal at 16) is contradicted by his own admissions. The erroneous abatement occurred no earlier than October 10, 1989. There is no genuine dispute that Becker learned at least as early as September 27, 1990, of the erroneous abatement and the anticipated reinstatement; his own affidavit, the truthfulness of which Becker vouched for at trial, stated that on that date he told Peters he would have the funds to pay the assessment upon its reinstatement. Thus, Becker was notified of the error and its intended correction less than a year after the error occurred. And, through his designated representative, Becker was notified of the April 18, 1991 reinstatement of the assessment some seven months after the reinstatement. Whatever the intervals, Becker has failed to make a case for disallowing the reinstatement of the assessment because of any estoppel.
 
 
 57
 Estoppel is an equitable doctrine invoked to avoid injustice in particular cases. While a hallmark of the doctrine is its flexible application, certain principles are tolerably clear:
 
 
 58
 "If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act ... the first person is not entitled"
 
 
 59
 . . . .
 
 
 60
 ". . . to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired."
 
 
 61
 Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) ("Community Health Services") (quoting Restatement (Second) of Torts § 894(1), at 381 (1979) ("Restatement")). "Thus, the party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." Community Health Services, 467 U.S. at 59, 104 S.Ct. 2218 (internal quotation marks omitted) (footnote omitted). Further,
 
 
 62
 "[t]he truth concerning these material facts must be unknown to the other party claiming the benefit of the estoppel, not only at the time of the conduct which amounts to a representation or concealment, but also at the time when that conduct is acted upon by him. If, at the time when he acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment."
 
 
 63
 Community Health Services, 467 U.S. at 59 n. 10, 104 S.Ct. 2218 (quoting Restatement § 810, at 219) (emphases ours).
 
 
 64
 Insofar as concerns an assertion of estoppel against the government, the Supreme Court has thus far declined to adopt a rule that the United States or its agencies may never in any circumstances be estopped; but it has made clear that "the Government may not be estopped on the same terms as any other litigant," because "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." Community Health Services, 467 U.S. at 60, 104 S.Ct. 2218; see, e.g., United States v. Boccanfuso, 882 F.2d 666, 669 (2d Cir.1989) ("The principle of equitable estoppel is not applied to the Government on the same terms as it is to private citizens. . . . The different standard for estoppel of the Government springs from the tenet that estoppel would frustrate the Government's ability to enforce the law and, in turn, undermine the public interest in full enforcement of the law.").
 
 
 65
 "Thus, assuming estoppel can ever be appropriately applied against the Government," Community Health Services, 467 U.S. at 66, 104 S.Ct. 2218, a "private party surely cannot prevail" on such an estoppel claim "without at least demonstrating that the traditional elements of an estoppel are present," id. at 61, 104 S.Ct. 2218. A party must therefore show that the Government made a misrepresentation on which the party reasonably relied to its detriment. We will not find an estoppel where the claimant "could not have reasonably relied on any Government misrepresentation." United States v. Boccanfuso, 882 F.2d at 670.
 
 
 66
 This Court has not previously addressed the question of whether a timely imposed and erroneously abated tax assessment may be reinstated by the IRS after the limitations period for the initial imposition of the assessment has expired. Other courts considering this and similar questions have, for the most part, applied estoppel-type principles and concluded that such a reinstatement was permissible where the person against whom the assessment was reinstated did not suffer unfair prejudice. See, e.g., Bugge, 99 F.3d at 745, 746 n. 7; Kroyer, 55 F.2d at 499; United States v. Buckner, 264 B.R. at 914-15; Crompton-Richmond, 311 F.Supp. at 1187.
 
 
 67
 In Kroyer, the United States Court of Claims considered the somewhat similar claim of a taxpayer against whom two IRS assessments had been made. The first was covered by a bond, which was paid; but the IRS erroneously credited the guarantor's payment against the second assessment. The IRS then abated the first assessment as uncollectible. The taxpayer filed a claim for a refund of the money paid by the guarantor, contending the application of that payment to the second assessment was illegal because the limitations period for collecting the second assessment had expired. The taxpayer's refund claim alerted the IRS to its misallocation of the payment; it thereupon reinstated the abated first assessment, reallocated the guarantor's payment to the first assessment, and rejected the taxpayer's refund claim.
 
 
 68
 The taxpayer brought suit in the court of claims, contending that he was entitled to a refund on the ground that (a) the IRS's collection of payment with respect to the second assessment was illegal because the statute of limitations on collection of that assessment had run, and (b) the abatement of the first assessment was irrevocable. The court rejected the latter contention because the taxpayer presented no evidence that the error had caused him any injury or prejudice. It stated that "the government [i]s not bound by some action of one of its officers resulting from a mistake of fact which, when such action was corrected, left the whole matter in such a situation that the party complaining had received no injury and been done no injustice." Kroyer, 55 F.2d at 499. The court concluded, "we do not think the government can be bound by the bookkeeping errors of its agents, when such errors in no way affect the real equities of the case or result to the prejudice of a party making a payment." Id.
 
 
 69
 In Bugge, the Fifth Circuit primarily took a different approach, holding that the erroneous abatement of an assessment simply had no effect. There, as here, the IRS had timely imposed a § 6672(a) penalty assessment (in Bugge for failure to pay a corporate windfall profits tax); some information as to the assessment was recorded in the taxpayer's master file; additional information was recorded only in a handwritten file because it "could not be fully entered into the `master file' as it was then configured on the IRS computer," 99 F.3d at 742. As a result of "inadvertent error[s]," id. at 746, facilitated by the nonmatching files, the taxpayer's liability was abated. When the error was discovered, the abated assessment was reinstated.
 
 
 70
 The Bugge court noted that I.R.C. § 6404(a), as discussed in Part II.A. above, permitted the IRS to abate the unpaid portion of an assessment if it was excessive in amount, untimely, or erroneously or illegally assessed. Because none of these circumstances existed in the case before it, the court concluded that the abatement had no legal effect. It stated, "we hold, that on the facts of this case, no effective tax abatement under the Secretary's statutory authority in I.R.C. § 6404(a)(1) ever occurred." Bugge, 99 F.3d at 745. "Because the regional service center accidentally processed an unapproved abatement, it follows that the abatement of Bugge's tax assessment ... was never effective. Simply put, an unauthorized and accidental abatement of an entire assessment in contravention of section 6404(a)(1) is not effective." Id. In a footnote that appears to be in tension with this holding, however, the Bugge court also stated that its opinion should not "be interpreted as granting the IRS a special shield from responsibility for its errors, inadvertent or otherwise, that prejudice the taxpayer." Id. at 746 n. 7.
 
 
 71
 In Crompton-Richmond, the IRS had abated an assessment through an error that was purely clerical, and the court ruled that the reinstatement was permissible. Citing Kroyer, the district court stated that "[w]henever an abatement is issued because of a mistake of fact or bookkeeping error, the assessment can be reinstated, at least so long as this does not prejudice the taxpayer." Crompton-Richmond, 311 F.Supp. at 1187.
 
 
 72
 Becker argues that the words "at least" in that stated rationale were intended to imply that circumstances other than prejudice to the taxpayer — such as unreasonable delay — could make reinstatement of the assessment impermissible, and that the reinstatement in Crompton-Richmond was upheld only because in that case the IRS had acted expeditiously in discovering its error and in correcting it. We doubt that the words "at least" were intended to carry such a weighty implication; but in any event we reject Becker's contention that a taxpayer is entitled to relief without having suffered any injury.
 
 
 73
 While we need not go so far as the Bugge court did and say that an erroneous abatement has no legal effect, we are persuaded that the traditional principles applicable to assertions of estoppel against the government, discussed above, must be applied. We conclude that an assessment — timely imposed within the limitations period and abated in error — may permissibly be reinstated to correct that error even after the limitations period for the initial assessment has expired where the person against whom the assessment has been reinstated has failed to show reasonable and detrimental reliance on the erroneous abatement.
 
 C. Becker's Claims of Prejudice
 
 74
 We agree with the district court that Becker's claims that he relied on the erroneous abatement of his § 6672(a) assessment are meritless as a matter of law. There is no question that both of the financial commitments on which Becker relies were undertaken after the IRS filed its § 6672(a) claim in his bankruptcy proceeding in November 1992. Moreover, prior to that time, as discussed in Parts I.A. and II.A. above, Becker was informed in July 1988 of the assessment, was informed not later than September 1990 that it had been abated in error and would be reinstated, and was informed in November 1991 of the reinstatement. In his bankruptcy petition in July 1992, Becker listed the § 6672(a) assessment for $150,000 as an undisputed claim. Becker's claim that after the IRS asserted its claim in his bankruptcy proceeding, he relied on the abatement for the proposition that he no longer had any § 6672(a) liability is, as aptly termed by the district court, "patently bogus."
 
 CONCLUSION
 
 75
 We have considered all of Becker's contentions and found them to be without merit. The judgment of the district court is affirmed.
 
 
 76
 CALABRESI, Circuit Judge, dissenting.
 
 
 77
 The majority holds that where a tax assessment is abated by virtue of a clerical error, the statute of limitations for tax assessments does not apply to the Internal Revenue Service's ("IRS'"s) "reinstatement" of the erroneously abated tax, see ante at 97-98. The majority, therefore, concludes that Debtor-Appellant Stuart Becker ("Becker") may not rely on the statute of limitations to argue that the government's "reinstatement" of his § 6672(a) liability was untimely. As a result, Becker is relegated to relying on equitable estoppel, see ante at 98. The majority then, understandably, determines that equitable estoppel does not apply on the facts before us, and hence rejects Becker's defense. See ante at 101. Because I disagree with the majority on the first of these conclusions, I respectfully dissent.
 
 
 78
 Under the Internal Revenue Code, 26 U.S.C. § 3101, et seq. (the "Tax Code" or "Code"), the IRS has three years from the date of the filing of a return to assess a tax deficiency against the taxpayer. See 26 U.S.C. § 6501(a). After that date, the IRS is barred from imposing a tax deficiency, absent certain statutory exceptions, not at issue here. See 26 U.S.C. § 6501(a) (indicating that "[e]xcept as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed...."); see also Bufferd v. Commissioner of Internal Revenue, 952 F.2d 675, 678 (2d Cir.1992) ("[T]he words of section 6501(a) [are] clear and unambiguous. Barring an exception, if the Commissioner wishes to assess a tax on an entity, he must do so within three years after the filing by that entity of the return on which the tax should have been reported.")
 
 
 79
 The majority does not seem to contest that, under § 6501(a), the IRS would have been barred from first assessing the tax at issue in this case on April 18, 1991 (the date on which Becker's liability was "reinstated"). And this bar would have existed even if the tax was not timely assessed because of a clerical error. Nor does the majority appear to dispute that some reinstatements of tax liability, following an abatement by the IRS, would be considered "assessments" subject to the three-year statute of limitations. For example, the majority seems to agree that — if Becker's tax liability had been abated because the IRS substantively reevaluated his tax liability — the IRS's attempted "reinstatement" of the tax would have been an "assessment," barred by § 6501(a). See ante at 97. The majority apparently concludes, however, that in some other instances — including abatement by virtue of uncollectability, or by clerical error — the "reinstatement" of a tax does not count as an "assessment," and thus is not subject to the aforementioned statute of limitations. See ante at 97-98, 101.[1]
 
 
 80
 While this framework is consistent with the result reached in some of the cases that have addressed this issue, it bears no relationship to the structure or language of the Tax Code. The Tax Code speaks in terms of the IRS's[2] ability to "assess" and "abate" taxes, and the effect of such actions. See, e.g., 26 U.S.C. § 6201, et seq. (addressing "Assessment"); 26 U.S.C. § 6401, et seq. (addressing "Abatements, Credits [and] Refunds"). Nowhere does the Code provide for the reinstatement of a previously abated tax (as distinguished from the imposition of a new assessment to counter a previous abatement). And, necessarily, the Code gives no indication that any self-declared "reinstatement" does not constitute an "assessment" subject to the ordinarily applicable statute of limitations. Moreover, if there is no authority for imposing a tax on a taxpayer except through an assessment — and, as above noted, neither the Code itself nor the majority gives any hint of the possible source of such other authority-then, by its express terms, the relevant statute of limitations must apply. It must apply, that is, unless an exception to the bar is provided for in the Code. See 26 U.S.C. § 6501(a) (stating that "[e]xcept as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed ....") (emphasis added); cf. United States v. Dalm, 494 U.S. 596, 609 n. 6, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990) (rejecting the dissenters' suggested means for avoiding the operation of the applicable statute of limitation, because it had no support in the Tax Code). But, neither the government, nor the majority, has pointed to any such statutory exception. I conclude that, in the Code as written, there is none, and that both text and context require that the statute of limitations govern.
 
 
 81
 The majority avoids addressing the problems that the plain language of the Code pose. It, instead, spends a good deal of time discussing why the usual policy reasons for the statute of limitations do not apply to the instant case. See ante at 97-98. This has, however, never been an acceptable legal justification for avoiding an otherwise applicable statute of limitations. See, e.g., Dalm, 494 U.S. at 616, 110 S.Ct. 1361 (Stevens, J., dissenting) (observing that "none of the policy reasons that normally support the application of a statute of limitations" were implicated, and decrying, on this and other grounds, the majority's refusal to recognize an exception to the applicable statute of limitations); see also Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan, 201 F.3d 44, 47 (2d Cir.1999) ("[S]tatutes of limitation `are not to be disregarded by courts out of a vague sympathy for particular litigants.'") (quoting Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (per curiam)).
 
 
 82
 To the contrary, the fact that policy — or equity — might support a different result in a particular case has regularly been rejected by the Supreme Court as a ground for deviating from an otherwise applicable statute of limitations. See, e.g., United States v. Brockamp, 519 U.S. 347, 348, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997); Dalm, 494 U.S. at 598, 616, 110 S.Ct. 1361. And, the High Court has been particularly assiduous about avoiding erosion of the statutes of limitations created by Congress in the tax context, noting the importance of uniform rules to prevent uncertainty in this highly complex and high-volume area of the law. See, e.g., Brockamp, 519 U.S. at 352-53, 117 S.Ct. 849.
 
 
 83
 Thus, although I agree entirely with the majority's sentiments that both policy and equity in the instant case favor the government — Becker is hardly a model taxpayer, and he undoubtedly seeks to profit at the expense of the public from the government's administrative errors-I cannot agree with its apparent conclusion that this fact can control our disposition of this case. Were it Becker who had made an error and failed to file a claim on time, no one would doubt that — however meritorious his claim, and however inapplicable the usual grounds for limitations statutes might be — he would be barred. And, no court would ignore plain statutory language to help him. See, e.g., Brockamp, 519 U.S. at 348, 117 S.Ct. 849 (rejecting the argument that equitable tolling applies to tax refund claims); see also Dalm, 494 U.S. at 598, 110 S.Ct. 1361 (significantly limiting the "equitable recoupment" doctrine).[3] Why should the government be treated differently from its citizens?
 
 
 84
 As the Supreme Court has observed, statutes of limitations "are by definition arbitrary, and their operation does not discriminate between the just and unjust claim, or the voidable and unavoidable delay." Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945). Because Debtor-Appellant Becker's tax liability was not reassessed against him until after the expiration of the statute of limitations, it was extinguished. And, this is so, whether or not the extinguishment of the government's claim appears "just" or "appropriate" to us. See, e.g., Rothensies v. Electric Storage Battery Co., 329 U.S. 296, 303, 67 S.Ct. 271, 91 L.Ed. 296 (1946) (in a tax case, observing that "[i]f there are to be exceptions to the statute of limitations, it is for Congress rather than the Courts to create and limit them"); see also Carey, 201 F.3d at 47 (noting that statutes of limitations should not be disregarded out of a sympathy for individual litigants).
 
 
 85
 The majority's decision, moreover, itself creates serious policy problems, problems that are largely unaddressed in its opinion. While Debtor-Appellant Becker's case may not tug at our heartstrings, it is not hard to imagine tax "reinstatements" following governmental administrative errors as to which good reasons for strict application of the statute of limitations are present.[4] In such cases, as a result of today's unfortunate decision, taxpayers will not be able to claim the protections of the relevant statute of limitations, but will instead be limited to the meager safeguards provided by the equitable estoppel doctrine. And, at least in our circuit, equitable estoppel only applies against the government where the government has engaged in affirmative misconduct. See City of New York v. Shalala, 34 F.3d 1161, 1168 (2d Cir.1994) (noting that "[w]e apply estoppel to the Government only in those limited cases where the party can establish both that the Government made a misrepresentation upon which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct.") (emphasis added).
 
 
 86
 It will, I fear, be the rare case in which a taxpayer will be able to prove that the government engaged in affirmative misconduct in reinstating an erroneously abated tax assessment. See generally Azizi v. Thornburgh, 908 F.2d 1130, 1136 (2d Cir. 1990) (finding that the government's negligent conduct did not provide a basis for estoppel). As a result, there will be many instances in which a taxpayer will be seriously and significantly prejudiced by the reinstatement of a tax, and yet in which equitable estoppel will not apply. I conclude that today's decision may well lead to injustices that far surpass any unfairness that might result from the application of the statute of limitations in the case before us. Cf. Rothensies, 329 U.S. at 301-02 & n. 3, 67 S.Ct. 271 (emphasizing that — although both taxpayers and the government may, in individual cases, be affected harshly by them — tax statutes of limitations do serve "primarily [as] an instrument of fairness").
 
 
 87
 Primarily because the majority's opinion has no basis in the text or context of the relevant Code provisions, and also because I believe that in the long run today's holding will do more harm than good, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 The majority explicitly rejects the rationale that has been relied on by some courts that have declined to apply § 6501(a)'s statute of limitations against the government. (These courts have held that because the abatement of the tax was not authorized under the abatement statute, 26 U.S.C. § 6404, it never became effectiveSee Bugge v. United States, 99 F.3d 740, 745-46 (5th Cir.1996); United States of America v. Cook, No. Civ.A.02-CV-09475, 2004 WL 690804, at *10 (E.D.Pa. Mar.22, 2004); cf. Crompton-Richmond Co. v. United States, 311 F.Supp. 1184, 1187 (S.D.N.Y.1970) (reaching the same result as the majority, without clearly articulating a rationale)). See ante at 101 ("we need not go as far as the Bugge court did and say that an erroneous abatement has no legal effect...."). The majority's rejection of this rationale is eminently sensible. For under this "ultra vires" rationale, the protections of the statute of limitations would essentially never apply to abatements (which, after all, are generally not retracted unless the IRS concludes that the tax did not fulfill the qualifications for abatement under 26 U.S.C. § 6404 in the first instance). See generally 26 U.S.C. § 6404(a) (indicating that a tax may be abated where it is: 1) "excessive in amount"; 2) "assessed after the expiration of the period of limitation properly applicable thereto"; or 3) "erroneously or illegally assessed.").
 Having rejected this "ultra vires" rationale, however, the majority seems either to lack any rationale for its holding, or to conclude implicitly that the reinstatement of Becker's tax was not an assessment, subject to the § 6501(a) statute of limitations. See ante 97-98, 101. In this dissent, I shall assume the latter.
 
 
 [2]
 Technically, the Code describes the authority of the Secretary of the Treasury to carry out certain tax-related activitiesSee, e.g., 26 U.S.C. § 6201(a) ("The Secretary is authorized and required to make ... assessments of all taxes ... imposed by this title ....") (emphasis added). The Secretary, however, has delegated this authority to various decision-making officials within the IRS, see generally 26 C.F.R. § 301.7701-9, and so I refer to the authority as being that of the IRS.
 
 
 [3]
 The lone equitable exception to the refund statute of limitations — the "equitable recoupment" doctrine — allowseither the government or the taxpayer to offset monies previously paid in error, as to which the statute of limitations has run, against an amount currently owed for the same taxable transaction. See Dalm, 494 U.S. at 604-05, 110 S.Ct. 1361. The Supreme Court has strictly limited the equitable recoupment doctrine to the narrow circumstances in which it originated. See, e.g., id. at 611, 110 S.Ct. 1361; Rothensies v. Electric Storage Battery Co., 329 U.S. 296, 302, 67 S.Ct. 271, 91 L.Ed. 296 (1946).
 
 
 [4]
 For example, a taxpayer who genuinely believed that a tax assessment had been correctly abated might — after the expiration of the assessment statute of limitations — take on significant new personal or professional financial obligations. Under the majority's opinion today, the IRS might reinstate a tax against such a taxpayer, after the expiration of the statute of limitations, even ifyears had elapsed prior to the government putting the taxpayer on notice of its error.